IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00790-PAB-NYW

CONCATEN, INC.,

    Plaintiff,

v.

AMERITRAK FLEET SOLUTIONS, LLC d/b/a Ameritrak,

    Defendant.

_____

**ORDER**
_____

This matter is before the Court on the motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) [Docket No. 32] filed by defendant AmeriTrak Fleet Solutions, LLC ("AmeriTrak"). The basis of AmeriTrak's motion is that the patents-in-suit, which involve relaying weather and road data to and from snow plows, are drawn to ineligible subject matter. *See* Docket No. 32. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND**[1]

Plaintiff Concaten, Inc. ("Concaten") owns all right, title, and interest to U.S. Patent Nos. 7,355,509 (the "'509 Patent"), 7,714,705 (the "'705 Patent"), 8,120,473 (the "'473 Patent"), 8,284,037 (the "'037 Patent"), and 8,497,769 (the "769 Patent") (collectively, the "patents-in-suit" and, excluding the '509 Patent, the "continuation

---

[1]For the purposes of resolving this motion, the Court accepts all of the complaint's well-pleaded allegations as true. *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006), *abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co.*, 545 F. App'x 750, 753 (10th Cir. 2013).

patents"). Docket No. 7 at 1-2, ¶ 1. Generally, the patents-in-suit describe a "maintenance decision support system" ("MDSS"), which Concaten describes as a "computer-based system that . . . provides State transportation departments' winter maintenance personnel with specific weather forecast information and treatment recommendations." Docket No. 7 at 5-6, ¶ 11. The MDSS incorporates various technological components, including automated vehicle location (also known as global positioning satellite, or "GPS"), and mobile data collection. *Id.* The patents-in-suit, according to Concaten, "allow transportation departments' managers, vehicle . . . operators and other personnel to monitor current/real-time data from vehicles in the field." *Id.* at 6, ¶ 12. Concaten alleges that AmeriTrak infringes one or more claims of the patents-in-suit by making, using, offering, providing, offering to sell, and/or selling "an array of MDSS related products and/or services . . . to its customers that embody the patented systems and/or substantially rely upon the information and data collected and transmitted via the patented systems." *Id.* at 6-7, ¶ 13.[2]

The '509 Patent, which is the parent application of the other patents-in-suit, is titled "Smart Modem Device for Vehicular and Roadside Applications." Docket No. 7-1 at 1. Claim 1 of the '509 Patent[3] reads:

---

[2]Concaten also brings claims for violation of the Lanham Act, *see* Docket No. 7 at 13-16, but those claims are not relevant to the instant motion.

[3]AmeriTrak states that claim 1 of the '509 Patent and claim 1 of the '705 Patent are representative of all of the claims of the patents-in-suit. *See* Docket No. 32 at 3-5. Concaten does not dispute that these claims are representative, and the Court has reviewed all claims of the patents-in-suit to satisfy itself that it may treat these claims as representative for the purpose of resolving AmeriTrak's motion for judgment on the pleadings. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1295 (2012) (for the purposes of deciding whether a patent is directed to an ineligible

> 1. A data collection and transmission system, comprising:
>
> at least one of a sensor and user interface operable to collect information regarding vehicle state and/or vehicle occupants;
>
> at least one slot operable to receive a selected network card, the at least one slot being configured to receive cards of multiple private and/or public networks;
>
> a plurality of sets of connection managers and monitors corresponding to different types and/or origins of network cards, each set comprising at least one connection manager to interact with the corresponding network card in establishing a connection with the corresponding wireless network and connection monitor to monitor a state of the connection and at least one of the connection manager and monitor of a first set being different than a corresponding at least one of the connection manager and monitor of a second set; and
>
> a system manager operable to determine a type and/or origin of network card and select and cause execution of the corresponding connection manager and monitor set to set up a connection with the network corresponding to the determined type and/or origin of network card.

*Id.* at 23.

The '705 Patent is titled "Maintenance Decision Support System and Method."

Docket No. 7-2 at 1. Claim 1 of the '705 Patent reads:

> 1. A method, comprising:
>
> (a) receiving over a wireless cellular network, from a plurality of snow maintenance vehicles and by a server, a plurality of sets of collected information, each of the collected sets of information comprising a snow maintenance vehicle physical location and at least one of weather and road conditions in an area of the respective snow maintenance vehicle;
>
> (b) processing, by the server, the received collected information to (i) provide a map associated with a physical location of a selected snow maintenance vehicle and (ii) determine an instruction for an operator of the selected snow maintenance vehicle; and

---

abstract idea, the court "may assume that the other claims in the patents do not differ significantly from [a representative claim].").

> (c) providing, over the wireless cellular network, the map and an operator instruction to the selected snow maintenance vehicle of the plurality of snow maintenance vehicles, wherein the map is visually displayed, by a touch screen monitor, to the operator and wherein the operator instruction to the selected snow maintenance vehicle operator comprises one or more of a dispatch command, an alarm based on a temporal trend in weather conditions, an alarm based on a difference in weather conditions, an alarm based on a temporal trend in road conditions, an alarm based on a difference in road conditions, a snow plow setting, a mixture of materials being applied to a road surface, and an amount of materials being applied to the road surface.

Docket No. 7-2 at 30.

AmeriTrak argues that the claims describe subject matter that is not eligible for patent protection because they merely recite the abstract idea of data collection and transmission performed using generic computer components. The Court held a *Markman* hearing on August 13, 2015, *see* Docket No. 69, but has not issued a claim construction ruling.

## II. STANDARD OF REVIEW

The Court reviews a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) much as it would a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Park Univ. Enters.,* 442 F.3d at 1244 ("We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion."). Accordingly, the Court "accept[s] all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same." *Id*. "Judgment on the pleadings is appropriate only when 'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"

*Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (quoting *Park Univ.*, 442 F.3d at 1244).

In ruling on whether a patent or patents claim eligible subject matter pursuant to 35 U.S.C. § 101, the Court need not first engage in claim construction. *Cyberfone Sys., L.L.C. v. CNN Interactive Grp.*, 558 F. App'x 988, 991 n.1 (Fed. Cir. 2014) (unpublished) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility"). Here, the Court finds that the subject matter of the patents-in-suit is "readily ascertainable from the face of the patent" and the Court can decide the instant motion without first issuing a detailed claim construction order. *MicroStrategy Inc. v. Apttus Corp.*, --- F. Supp. 3d ----, 2015 WL 4425828, at *1 n.4 (E.D. Va. July 17, 2015) (proceeding with § 101 inquiry without having construed claims of the patent-in-suit).

## III. ANALYSIS

AmeriTrak argues that the patents-in-suit are drawn to ineligible subject matter. Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Supreme Court precedent carves out three specific exceptions to Section 101's broad patentability principles: laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). These exceptions represent "the basic tools of scientific and technological work." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct.

2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2013)). "Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (citation and quotation omitted). Accordingly, courts must distinguish between patents that claim the "building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* (citation and quotation omitted). In *Alice Corp.*, the Supreme Court clarified that "[w]holly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." 134 S.Ct. at 2350-51 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1297 (2012) (alteration marks omitted).

To determine whether a patent is drawn to patent-eligible subject matter, the Supreme Court has devised a two-step inquiry. *See Alice Corp.*, 134 S.Ct. at 2355; *see also Mayo*, 132 S.Ct. at 1296-97. First, the court determines "whether [the] claim is 'directed to' a patent-ineligible abstract idea." *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346-47 (Fed. Cir. 2014) (citing *Alice Corp.*, 134 S.Ct. at 2355). If so, the court "then consider[s] the elements of the claim – both individually and as an ordered combination – to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea. This is the search for an 'inventive concept' – something sufficient to

ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Id.* (citation omitted).

### A. Step One

At step one, AmeriTrak argues that the '509 Patent is directed to the abstract idea of "collecting information from a vehicle and transmitting it," Docket No. 32 at 8, and that the other patents-in-suit are directed to the abstract idea of sending a map or instructions to a snow plow over a wireless network. *Id.* at 10-11. Concaten responds, first, that the patents-in-suit do not fall into one of the categories of ineligible concepts identified in *Alice Corp.* and, second, that the patents-in-suit are concerned with "the dynamic optimization of the allocation of snowplow resources in view of real time conditions," which is not an abstract idea. *See* Docket No. 37 at 6-8.

As a preliminary matter, the Court is not persuaded by Concaten's argument that, to contest eligibility under Section 101, an alleged infringer must demonstrate that a patent falls into one of four categories of ineligible subject matter.[4] This narrow reading of *Alice Corp.* is foreclosed by the opinion itself, which specified that the Court's opinion did not "delimit the precise contours of the 'abstract ideas' category." *Alice Corp.*, 134 S.Ct. at 2357. Moreover, the Federal Circuit has applied *Alice Corp.* on multiple occasions to invalidate patents without assigning the patents to a broader category of ineligible abstract ideas. *See, e.g., Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (holding that a patent that described the process of displaying

---

[4]Concaten claims that these four categories are: fundamental economic practices, methods of organizing human activities, "an idea of itself," and mathematical relationships and formulas. *See* Docket No. 37 at 6.

advertisements to end users in exchange for access to copyrighted media described an abstract idea); *see also Content Extraction*, 776 F.3d at 1347.

Turning to the representative claims of the patents-in-suit, the Court finds that the '509 Patent is directed to an abstract idea: namely, collecting information from a vehicle and transmitting that information over a network. The Federal Circuit's decision in *Ultramercial* is instructive. In that case, the court considered a patented method of

> (1) receiving copyrighted media from a content provider; (2) selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; (3) offering the media for sale on the Internet; (4) restricting public access to the media; (5) offering the media to the consumer in exchange for watching the selected ad; (6) receiving a request to view the ad from the consumer; (7) facilitating display of the ad; (8) allowing the consumer access to the media; (9) allowing the consumer access to the media if the ad is interactive; (10) updating the activity log; and (11) receiving payment from the sponsor of the ad.

*Ultramercial*, 772 F.3d at 714-15. The Federal Circuit held that the method merely described the abstract idea of using advertising as an exchange or currency and was "devoid of a concrete or tangible application." *Id.* at 715. Likewise, in *Content Extraction*, the Federal Circuit held that patents that recited a method of (1) extracting data from hard copy documents using a scanner, (2) recognizing specific information from that data, and (3) storing that information in memory recited a well-known abstract idea. 776 F.3d at 1347. The *Content Extraction* court further noted that "humans have always performed" the functions of collecting, recognizing, and storing data, and that, notwithstanding the requirement that the functions be performed on a scanner, the claims were "drawn to the basic concept of data recognition and storage." *Id.*

8

In *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015), the Federal Circuit considered a patented price-optimization method with the following limitations: "(1) testing a plurality of prices; (2) gathering statistics generated about how customers reacted to the offers testing the prices; (3) using that data to estimate outcomes (i.e. mapping the demand curve over time for a given product); and (4) automatically selecting and offering a new price based on the estimated outcome." *Id.* at 1361. The court found that the "concept of offer-based price optimization" was an abstract economic concept and that "the claims merely recite well-understood, routine conventional activities, either by requiring conventional computer activities or routine data-gathering steps." *Id.* at 1363 (citation, quotation, and alteration omitted).

The '509 patent describes an abstract idea: namely, collecting information and transmitting it over a network – or, in the language of the '509 Patent, "collecting selected types of information in vehicular and roadside applications and transmitting at least some of the collected information to a remote server." Docket No. 7-1 at 14, Col. 2, ll 34-37. Although the '509 Patent describes itself as a "smart modem" device, the specific claims are limited to collecting and transmitting information "regarding vehicle state and/or vehicle occupants." Docket No. 7-1 at 23. The patent does not describe a new device or improvement in any specific device that would convert the scope of its claims from abstract idea to patent-eligible innovation.

The Court now turns to the continuation patents, treating claim 1 of the '705 Patent as representative. AmeriTrak argues that claim 1 of the '705 Patent only recites the abstract idea of providing a map or instructions to a snow plow over wireless cellular networks. Docket No. 32 at 10. AmeriTrak argues that the Court's consideration of the

continuation patent should be limited to the final step of providing a map or instructions to the snow maintenance truck operator because, during a 2011 reexamination of the '705 Patent (conducted on a "petition to review refusal to order *inter partes* reexamination"), the examiner found that the prior art described the steps of sending sensor data from a snow plow truck over a wireless communications network to a central server and found that the only new concept in the '705 Patent was the transmission of information back from the server to the snow plow truck.  Docket No. 32 at 10-11, *see also* Docket No. 33-1 at 7.  AmeriTrak cites *McRO, Inc. v. Activision Publ'g, Inc.*, 2014 WL 4759953 (C.D. Cal. Sept. 22, 2014), for the principle that a patent that appears on its face to recite tangible steps can be invalid if the only step not found in the prior art is an abstract idea.  Docket No. 32 at 10-11.  The Court rejects AmeriTrak's attempt to limit the scope of the Continuation Patents as premature.  In *McRO*, the court compared the claims of the relevant patents to the "prior art recited in the patents" themselves.  2014 WL 4759953, at *10.  Here, in contrast, AmeriTrak asks the Court to consider evidence outside the pleadings, namely, the 2011 decision of the United States Patent and Trademark Office denying a request to conduct an *inter partes* reexamination.  The Court cannot consider this evidence without converting AmeriTrak's motion into a motion for summary judgment.  *See Lowe v. Town of Fairland, Okl.*, 143 F.3d 1378, 1381 (10th Cir. 1998).  The Court declines to do so.

     Considering the entire scope of claim 1 of the '705 Patent, the Court finds that the claim is drawn to the concept of receiving, processing, and transmitting data.  This, like the process of collecting, recognizing, and storing data in *Content Extraction*, is an

abstract idea. *See* 776 F.3d at 1347. And, like the method patents in *Ultramercial*, the claim here merely recites known steps and offers no "concrete or tangible application." 772 F.3d at 715.

Concaten characterizes the '705 patent as directed to the tangible concept of "dynamic optimization of the allocation of snowplow resources in view of real time conditions." Docket No. 37 at 8. The Court disagrees. The '705 patent does not claim any previously-unknown method of optimization. The patent describes only the idea of receiving information from snow plows, processing the information, and sending an "operator instruction" and a map back to the snow plow operator. *See* Docket No. 7-2 at 30. While the '705 Patent provides an extensive list of possible operating instructions (*e.g.*, a "dispatch command, an alarm based on a temporal trend in weather conditions," etc . . .), it does not describe any new method for using the collected data to determine an optimal instruction for a given set of circumstances. *See id.* It merely provides for "processing" the received information to determine the appropriate instruction. As demonstrated by *OIP*, a claim does not satisfy Section 101's eligible subject matter requirement by reciting generic computer implementation to "optimize" an already-understood process. *OIP*, 788 F.3d at 1361, 1363.

The '705 Patent's claim is similar to the method claim in *SmartGene, Inc. v. Advanced Biological Labs, SA*, 555 F. App'x 950 (Fed. Cir. 2014) (unpublished), which the Federal Circuit found was directed to an abstract idea. In *SmartGene*, the patent described a computerized "method for guiding the selection of a therapeutic treatment regimen for a patient with a known disease or medical condition." *Id.* at 954. The steps

11

of the patent were "(1) 'provid[ing] patient information to a computing device' having routine input, memory, look-up, comparison, and output capabilities and that (2) 'generates a ranked listing of available therapeutic treatment regimens' and (3) 'generates advisory information for one or more therapeutic treatment regimens in said ranked listing.'" *Id.* at 954-55. The patent further specified that the computing device would contain a set of "expert rules for evaluating and selecting" from a stored "plurality of different therapeutic treatment regimens" as well as "advisory information useful for the treatment of a patient with different constituents of said different therapeutic treatment regimens." *Id.* at 955. The court held that the method merely described a computerized version of the mental process that doctors "routinely and consciously perform," and the patent was therefore directed to an abstract mental process. *Id.*

Here, as in *SmartGene*, the "optimization" in the '705 Patent is nothing more than taking steps routinely performed by humans – determining an instruction for a snow plow based on road conditions and vehicle locations – and applying them on a computer through unexplained "processing" of data.[5]

---

[5]It is not clear whether "processing" the information to return an operator instruction refers to an automated system of determining such an instruction or to generating a report so that a human decisionmaker can determine and then transmit the instruction. In its discussion concerning step two of the Section 101 analysis, Concaten refers to a document titled "Design and Implementation of Automated Vehicle Location and Maintenance Decision Support System for the Minnesota Department of Transportation" that suggests that Concaten's patented system is used to generate reports that "are useful for *supervisors* to optimize service level and coach snow plow drivers on proper chemical types and application rates." Docket No. 37 at 12 (emphasis added). Whether the instruction is determined using an automated process or via a human decisionmaker, however, the result is the same, as either option would claim a mental process.

Moreover, the notion of "dynamic optimization" of resources in view of "real time conditions" appears to describe the concept of logistics, which is used across a wide spectrum of fields. As AmeriTrak persuasively argues, the concept embodied in the '705 Patent is similar to the operations of fleet dispatchers who direct shipments via the use of CB radios. *See* Docket No. 40 at 5. Thus, even if the Court accepted Concaten's characterization of claim 1 of the '705 Patent, the patent would still be directed to the abstract idea of "optimization of resources in view of real-time data."

### B. Step Two

Having determined that the patents-in-suit are directed at abstract ideas, the Court must determine whether the patents include "additional features to ensure that the claim[s are] more than a drafting effort designed to monopolize the abstract idea." *Alice Corp.*, 134 S.Ct. at 2357 (citation omitted). AmeriTrak argues that the patents-in-suit merely recite generic computer implementation. Docket No. 32 at 11. Concaten responds that AmeriTrak failed to consider the claims of the patents-in-suit as an "ordered combination," and that the claims in the patents-in-suit are analogous to claims that the Supreme Court found to be patentable in *Diamond v. Diehr*, 450 U.S. 175 (1981). Docket No. 37 at 10-11.

The Court agrees with AmeriTrak that the claims of the patents-in-suit do not add any additional features that transform the claimed abstract idea into a patentable invention.[6] With respect to the '509 Patent, the only elements added to the well-known practice of collecting information and transmitting it over a network are (1) limiting the

---

[6]The Court's conclusion is the same whether it considers the elements of the claims of the patents-in-suit individually or as an ordered combination.

information collected to information regarding vehicle state and/or vehicle occupants, and (2) the use of generic computer and/or wireless network components such as a "sensor," a "slot," "sets of connection managers and monitors," and a "system manager." *See* Docket No. 7-1 at 23. Neither the recitation of these components nor limiting the scope of the patent to collecting information "regarding vehicle state and/or vehicle occupants" alters the nature of the idea itself. *Alice Corp.*, 134 S.Ct. at 2358 (neither "limiting the use of an abstract idea to a particular technological environment" nor stating an abstract idea while adding "wholly generic computer implementation" can transform an abstract idea into a patentable invention). The '509 Patent does not claim any improvement in the technology required to implement its steps of data collection and transmission. In fact, the '509 Patent itself demonstrates that it relies on existing technology or anticipated technological developments to implement its abstract idea. The "detailed description" in the '509 Patent states that the patent "utilizes advances from the programming and computing component industries to create a modular modem that its users can much more easily program and integrate into new or existing networks, and which can be used interchangeably in fixed and mobile applications with a variety of data and communication alternatives." Docket No. 7-1 at 17, col. 7, ll 8-13.

Likewise, the Court finds that claim 1 of the '705 Patent does not add any material to the abstract idea of receiving, processing, and transmitting data. The claim simply recites known, generic components such as a "wireless cellular network," a "server," and a "touch screen monitor," and applies the generic term "processing" without further specification to determine a resulting instruction. *See* Docket No. 7-2 at 30. *See Alice Corp.*, 134 S.Ct. at 2351 (a claim that "recite[s] a handful of generic

computer components configured to implement the [abstract] idea" is insufficient to transform an abstract idea into a patentable invention at step two); *see also buySAFE, Inc. v. Google*, *Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("[t]hat a computer receives and sends the information over a network – with no further specification – is not even arguably inventive").

The Court is not persuaded by Concaten's attempt to analogize its patents to the patents in *Diehr* or its argument that its patents "improve[] the existing technological process of allocating snow plow resources." See Docket No. 37 at 11-13. In *Diehr*, the Supreme Court considered the Section 101 eligibility of a claimed process for curing molded rubber articles that involved installing rubber in a press, closing a mold, constantly monitoring the temperature of the mold, constantly recalculating the appropriate cure time through the use of a well-known mathematical formula performed on a digital computer, and opening the press at the proper time. 450 U.S. at 187. The Court noted that, prior to the claimed invention, the temperature inside the mold was an unknown variable which meant that the industry was not able to achieve uniformly accurate cures. *Id.* at 178, n.4. The Court held that the process did not seek patent protection of the mathematical formula, but rather of an inventive process of curing rubber. *Id.* at 187. The Court in *Alice Corp.* noted that, because the patent in *Diehr* "improved an existing technological process," it was not directed to ineligible subject matter. 134 S.Ct. at 2358.

Concaten argues that, like the *Diehr* patent, its claims improve "the existing technological process of allocating snow plow resources." Docket No. 37 at 13.

Concaten, however, has not pointed to any problem in the existing process that the industry had been unable to solve. Concaten points to a document titled "Design and Implementation of Automated Vehicle Location and Maintenance Decision Support System for the Minnesota Department of Transportation" that credits Concaten's system with improving its existing system of deploying snow plow resources. *See* Docket No. 37 at 12-13. But the fact that the patents-in-suit may have a useful implementation does not mean that they do not claim an abstract idea. If mere usefulness in an established field were the determining factor, the purpose of Section 101 would be eviscerated. Instead, the question to be resolved at Step Two is whether the patents-in-suit add anything to the abstract ideas of data collection and transmission. The Court finds that they do not, as any improvement to the process stems merely from taking a known abstract idea and applying it in the context of snow plow maintenance using generic, existing computer and networking technology.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant AmeriTrak Fleet Solutions, LLC's Motion for Judgment on the Pleadings [Docket No. 32] is **GRANTED**. It is further

**ORDERED** that plaintiff Concaten, Inc.'s first, second, and third claims for relief are dismissed with prejudice on the ground that U.S. Patent Nos. 7,355,509, 7,714,705, 8,120,473, 8,284,037, and 8,497,769 describe ineligible subject matter. Plaintiff's fourth claim for relief remains pending. It is further

**ORDERED** that defendant AmeriTrak Fleet Solutions, LLC's Motion for a Claim Construction Hearing [Docket No. 51] is **DENIED** as moot.

DATED September 23, 2015.

                                        BY THE COURT:

                                        s/Philip A. Brimmer
                                        PHILIP A. BRIMMER
                                        United States District Judge